Orville **SELLON** and Levy Baggs, Administrator of the Estate of Alice Baggs, Deceased, Plaintiffs,

**General Motors Corporation, a Corporation of the State of Delaware, Defendant and Third-Party Plaintiff,**

v.

**Christine F. SMITH, Third-Party Defendant.**

**Civ. A. No. 79–611.**

United States District Court, D. Delaware.

March 29, 1986.

William J. Wier, Jr., Herlihy & Wier, Wilmington, Del., for plaintiffs.

Somers S. Price, Jr., Potter Anderson & Corroon, Wilmington, Del., George Lavin, Liebert, Short, Fitzpatrick and Lavin, Philadelphia, Pa., for defendant and third-party plaintiff.

Wayne Elliott, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for third-party defendant.

## ORDER

LONGOBARDI, District Judge.

WHEREAS, Defendant General Motors Corporation ("GM") has filed objections to the order of the United States Magistrate dated December 4, 1984, imposing sanctions on GM for failure to comply with a discovery order,

The Court having considered the briefs and affidavits of the parties,

IT IS ORDERED that:

1. GM's claim of attorney-client privilege with regard to certain edited portion of documents previously produced is remanded to the United States Magistrate for consideration.

2. The United States Magistrate's order requiring GM to produce "any report dated between January 1, 1966, and January 13, 1978, which pertains to any fuel system design proposed, suggested, investigated, studied, considered, analyzed and/or tested by GM" is affirmed.

3. The Magistrate's order requiring GM to produce a document entitled "Fuel Tank Impact Security" is affirmed.

4. GM shall pay Plaintiffs their reasonable expenses, including attorney's fees, incurred in connection with their motion for sanctions.

REASONS

GM failed to raise the issue of attorney-client privilege in the proceedings before the Magistrate and now seeks to raise it for the first time on this appeal. This

case was referred to the Magistrate with the intention that the Magistrate, not the Court, decide discovery disputes in the first instance. Since the Magistrate has not had an opportunity to rule on GM's claim of privilege, this claim will be remanded. On remand, the Magistrate may consider both the merits of GM's claim of privilege and whether GM has waived the claim by failure to properly assert it at an earlier stage in the proceedings.

2. As all parties have recognized, the rulings of the United States Magistrate must be upheld unless "clearly erroneous or contrary to the law." Fed.R.Civ.P. 72(a). On a motion for sanctions, the Court is empowered to "make such orders as are just." Fed.R.Civ.P. 37(b). Rule 37(b) grants broad discretion to the court, particularly where the drastic sanction of default is not imposed. *DiGregorio v. First Rediscount Corporation*, 506 F.2d 781, 788 (3d Cir.1974).

■ Here, the Magistrate found that GM had adopted an unreasonably narrow construction of Plaintiffs' document requests and, therefore, failed to respond properly to the request. Using the broad discretion granted by Rule 37(b), the Magistrate imposed a broad discovery order on GM as a means of ensuring that GM does not unreasonably withhold documents from Plaintiffs. The Court agrees that GM's construction of the document request was unreasonable and considers the Magistrate's order an appropriate remedy.

■ 3. GM has never provided the names or positions of persons to whom the contents of the document "Fuel Tank Impact Security" have been revealed. In order to claim the attorney-client privilege, GM has the burden of demonstrating that it has kept the documents confidential. Since GM has failed to carry this burden, despite numerous opportunities to do so, the Magistrate properly denied GM's claim of privilege and ordered GM to produce the document within fifteen (15) days. *See, International Paper Company v. Fibreboard Corporation*, 63 F.R.D. 88 (D.Del. 1974).

■ 4. The Court agrees with the United States Magistrate that GM's position on this motion was not substantially justified. GM is, therefore, ordered to pay Plaintiffs their reasonable expenses, including attorney's fees, incurred in connection with this motion. This payment shall reimburse Plaintiffs for expenses incurred both in the proceedings before the Magistrate and on this appeal. The matter is remanded to the Magistrate for determination and award of these expenses.

## MEMORANDUM OPINION

Oct. 30, 1984

N. RICHARD POWERS, United States Magistrate.

The matter before the Court is the plaintiffs' motion for sanctions against defendant General Motors Corporation ("GM") because of GM's alleged failure to comply with this Court's order of June 4, 1984 (Dkt. 207). The matter has been briefed by the parties and the Court heard argument on October 4, 1984. One of the major points argued by plaintiffs is that GM has failed to produce certain data for auto crash testing that was carried out by GM in the 1966–1970 time period. GM contends that it has made a reasonable search for all documents falling within plaintiffs' discovery requests to which this Court ordered a response. Because of the general nature of GM's response, the Court is not quite certain that it completely understands GM's position. Rather than deal in generalities, as GM's counsel did at oral argument, the Court herein seeks GM's position on a specific set of documents.

Plaintiffs represent that GM has produced reports on only one crash test of a vehicle with an over-the-axle fuel tank that was conducted between 1966 and 1970, a test of a 1964 Rover which failed the impact test. They point to a number of documents which they suggest hint strongly that other crash tests were conducted during the relevant time period. The Court's review of these documents prompts the following observations.

The minutes of a January 14, 1966 meeting of the Automotive Subcommittee of the General Technical Committee contain the following statement:

"Mr. Chichowski reported some results of recent crash tests. After extensive discussion it was agreed that the fuel tank filler pipe should be removed from the license plate area. Relocation of this in the rear quarter panel should alleviate vent problems and minimize filler pipe vulnerability. A longer study is required to determine the safest practical fuel tank location. Dkt. 208, Exh. 3.

The minutes of a February 8, 1966 meeting of the same subcommittee report as follows:

Mr. Chichowski reported that car-to-car crash tests had been run at 30 mph to evaluate filler neck construction, tank location and decelerations, and fuel pressure in the tank. A portion of this investigation included impacting [the] filler area with a 16-inch diameter pole on a cart (total weight 3100 lb) at 10 mph. The car-to-car test results are summarized on attachment C. The Proving Ground will continue work in this area to develop recommendations for standard fuel tank location and mounting.", *id.,* Exh. 4.

Since the meeting of January 14, 1966 refers to already completed crash tests, these tests probably took place prior to January 1, 1966. However at plaintiff's prodding, GM subsequently produced a report of one H. Kehrl of the Oldsmobile Division dated February 16, 1968. That heavily redacted report contains the following snippets:

"We have now extended and revised our test program as a result of Mr. Lundstrom's proposed 1972 aims. In our original test program the cars were impacted rearward into a fixed barrier at 30 MPH. The new test program uses the moving barrier, and rather than impacting at 30 MPH, we impact at the proposed 40 MPH.

. . . .

"We have now completed several tests with the moving barrier at 40 MPH.

. . . .

"As a result of this question, we have conducted a series of tests to compare the merits of the vertical tank in the kick-up area (i.e. over-the-axle), just behind the rear axle versus the present day horizontal tank which is directly under the trunk" (Dkt. 215, Exh. 1)

The latter document indicates that subsequent to the 30 MPH tests and subsequent to the January 14, 1966 meeting, additional crash tests were conducted at 40 MPH and that some of the tests involved placement of the fuel tank in the over-the-axle area. These tests have not been produced to plaintiffs. I seek GM's position as to the specific crash test results referred to in the report of H. Kehrl:

1. Is it GM's position that a reasonable search has been made and these test results cannot be located?

2. Or is it GM's position that it is in possession of the test data, but that the data does not fall within the purview of a discovery request it has been ordered to answer?

3. If GM's answer to question 2 is in the affirmative, it shall provide a brief explanation why the data does not fall within the purview of plaintiff's document request, Section D, numbers 1(d) or 2(a).

GM is directed to provide a response to these questions within ten days of the date of this Memorandum. The response should be brief and in no circumstances longer than five pages. The Court will reserve ruling on plaintiff's motion until it has received GM's response to the above questions.

### MEMORANDUM OPINION

#### Dec. 4, 1984

The matter before the Court is the motion of the plaintiff to enforce this Court's discovery order of June 4, 1984, and for other relief, including sanctions, for defendant's failure to provide discovery. I

will grant in large part the relief sought by plaintiff. In this case the plaintiffs have brought a products liability action against the defendant, General Motors Corporation ("GM"), alleging, *inter alia*, that GM's negligent design and construction of the fuel storage system in a 1973 Oldsmobile Omega caused a post-collision, fuel-fed fire which caused severe bodily injuries to the plaintiffs.

By order dated June 4, 1984, the Court ordered GM to comply with certain discovery requests propounded by plaintiffs. In the instant motion the plaintiffs claim that in several respects GM has failed to comply with its discovery requests despite the Court's order. I will deal with each area of controversy.

1. Redacted versions of documents.

Subsequent to the Court's earlier order, GM produced a number of documents to plaintiffs in redacted form. Plaintiffs insist that GM should not be the final arbiter of what is relevant or irrelevant in a particular document. The Court agrees. From the samples supplied by plaintiffs' counsel, it appears that some of the editing is so extreme that it is impossible to get any meaning out of the snippets that were produced. The overall context of a statement is often significant in determining its meaning. Also there is a reasonable possibility that relevant passages were deleted in error. There is no claim here that any of the edited materials were withheld on grounds of privilege, only a question of relevance, and there is a protective order in effect in the event that the omitted materials contain trade secrets or other proprietary information.

Nor does the Court regard an *in camera* inspection of the documents, as suggested by GM, an adequate substitute for review by plaintiffs' counsel. The parties' representatives are obviously in a far better position than this Court to adjudge the significance of the omitted passages. Finally, at oral argument, counsel for GM agreed to let plaintiffs' counsel inspect complete versions of the documents produc-ed so far, provided that no further use could be made of the document by plaintiffs unless or until the Court so orders. The Court is not going to get involved in yet another round of arguments over whether or not some passage is relevant. GM will be ordered to produce within 15 days the complete versions of the documents that have been produced in redacted form.

2. Documents relating to tests of alternative fuel systems.

Following oral argument, the Court directed GM to explain why certain crash tests of alternative fuel systems referred to in the Kehrl report had not been produced to plaintiffs. (See Dkt. 220). Specifically, the Court sought GM's position as to why such data did not come within the purview of plaintiffs' document request, Section D, numbers 1(d) or 2(a). GM has responded and the Court accepts its explanation respecting Section D, number 2(a). The same cannot be said for GM's explanation concerning Section D, number 1(d). That request seeks the production of any report dated between January 1, 1966 and January 13, 1978 which pertain to any alternative fuel system design proposed, suggested, investigated, studied, considered, analyzed, and/or tested for possible incorporation in the 1969 through 1975 X-body series vehicles. The Court has read GM's explanation and the reports submitted with its letter, and it is unable to find a justification for GM's position. From GM's repeated emphasis on the phrase "for possible incorporation in the 1969 through 1975 X-body series vehicles" the Court surmises that it is GM's position that inasmuch as the 1968 test data referred to in the Kehrl report did not specifically mention X-body vehicles, that report does not fall within plaintiffs' document request. To accept GM's reasoning would be to ignore the reality of the situation. From the context of the documents that have been produced by GM, it is apparent that GM was crash testing alternative fuel storage systems in anticipation of the enactment of more strin-

gent government safety standards for fuel system integrity. In other words, GM's goal was general product improvement. It is sophistic for GM to assert that the tests do not fall within plaintiffs' document request because they relate to overall product improvement as opposed to the improvement of a particular product, i.e. 1969 through 1975 X-body vehicles. The scope of plaintiffs' document request Section D, number 1(d) is manifestly broad and it was unreasonable for GM to construe it so narrowly. The Court is convinced that any modifying language is likely to be interpreted by GM in such a manner so as to result in further disagreement as to the scope of the document request which would in turn involve more judicial involvement in adjudicating the dispute, and so on. Consequently, GM will be ordered to produce within 60 days any report dated between January 1, 1966 and January 13, 1978 which pertains to any fuel system design proposed, suggested, investigated, studied, considered, analyzed, and/or tested by GM. As articulated by the Court, GM's assignment is now unambiguous by any standard.

3. Documents relating to rear impact tests conducted by General Motors between January 1, 1966 and January 13, 1978 on any passenger vehicle incorporating a fuel tank over the rear axle in the kick-up area.

The Court's ruling on reports pertaining to alternative fuel systems discussed in section (2) *supra* may resolve the dispute respecting rear impact tests. Plaintiffs make a compelling argument on the basis of documents they have obtained that in the time period 1966 through 1970, GM was giving consideration to several alternative fuel storage systems, including an over-the-axle fuel tank design. Nonetheless GM has only produced one crash test report for

an over-the-axle fuel tank configuration conducted during the 1966–1970 time period, a crash test involving a 1964 Rover, a British automobile. GM contends that it has made a reasonable search and this is the only test for that time period falling within the purview of plaintiffs' document request. On the basis of the documents quoted by plaintiffs, the Court shares plaintiffs' skepticism that everything responsive to its document request has been produced.[1] I suppose it is possible in an absolute sense that GM could have considered and ultimately rejected the over-the-axle fuel tank design without extensive testing. However, I believe such a possibility is remote. Similarly it is possible that such tests were conducted and the reports subsequently destroyed pursuant to a document retention policy, but again I believe that possibility is remote.

Plaintiffs' document request, Section D, number 2(a) calls for test reports pertaining to <u>rear impact tests conducted by General Motors</u> between January 1, 1966 and January 13, 1978 on any passenger vehicle <u>incorporating a fuel tank over the rear axle in the kick-up area.</u> In its response to the Court GM has emphasized the above underlined phrases as being significant limiting factors. I suspect that, as with the document request discussed in section (2), GM is engaging in a very narrow interpretation of the document request, although in this instance I have not been able to discern what that interpretation is. As mentioned earlier, the Court's directive in section (2) is broad enough to bring any pertinent data in GM's possession to light so that it is unnecessary to consider at this time the further relief sought by plaintiffs.

4. Privileged Document

GM has resisted production of documents pertaining to the deletion of the language

---

1. At oral argument, GM asserted that plaintiffs' charges necessarily impugn the integrity of GM's trial counsel, local counsel, in-house counsel, and everyone else who participated in the search for documents responsive to plaintiffs' request. In sharing plaintiffs' doubts, the Court is not making any inference respecting the integrity of the GM representatives in this case.

The Court merely concludes, on the basis of the documentary evidence proffered by plaintiffs and some reasonable assumptions about the thoroughness of GM's R & D efforts, that it is highly probable that GM engaged in some crash testing of over-the-axle fuel tank systems in the 1966–1970 time period.

"fuel tank impact security" found in its 1975 advertising materials after such language appeared in the 1973 and 1974 advertising materials. At the oral argument on plaintiffs' original motion to compel, GM represented for the first time that the only document responsive to the request was entitled to a claim of privilege. In its opinion of May 3, 1984, the Court directed GM to identify the document so that plaintiffs could challenge the claim of privilege if they desired. GM has never provided an identification of the document as required by opinions of this Court going back at least as far as *International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88 (1974). At the oral argument on plaintiffs' motion for sanctions, GM handed to the Court a copy of the document for an *in camera* review. This will not suffice. While the message contained in the document might qualify for the claim of privilege, the matter is far from certain, and in the absence of a showing of the corporate position of any of the named recipients of the document or persons mentioned in the document or the names and corporate position of any other person to whom the contents of the document have been divulged, all as required by *Fibreboard*, 63 F.R.D. at 93–94, the Court cannot sustain the claim of privilege. Thus GM will be ordered to produce the document within 15 days.

5. Attorneys' fees

Under F.R.Civ.P. 37(a), (b) where a court grants relief under a motion to compel, the court shall require the party whose conduct necessitated the motion to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified. As is abundantly clear from the foregoing discussion, GM's position has not been justified, and has necessitated a substantial expenditure of effort by plaintiffs' counsel to obtain discovery ordered by this Court some months ago. Consequently, the Court will award plaintiffs their reasonable expenses incurred in prosecuting this motion, including attorney's fees. However counsel for plaintiff shall not submit his fee request until after any appeals from this decision are considered by the district judge assigned to this case.